**CONSOLIDATION COAL COMPANY, a corporation, Appellee,**

v.

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, and Local Union Nos. 5497, 2262, 1441, 1785, 1810, 1941, 1447, 6271, United Mine Workers of America, Appellants,**

and

**District No. 6, United Mine Workers of America, Defendant.**

No. 75–1623.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1976.

Decided June 25, 1976.

John W. Cooper and Charles E. DeBord, II, Wellsburg, W. Va. (Pinsky, Mahan, Barnes, Watson, Cuomo & Hinerman, Wellsburg, W. Va., on brief), for appellants.

Daniel L. Stickler, Pittsburgh, Pa. (Rose, Schmidt & Dixon, Pittsburgh, Pa., Alfred J. Lemley, Furbee, Amos, Webb & Critchfield, Fairmont, W. Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

Consolidation Coal Company (Consol) brought suit against the International Mine Workers Union, District 6, and United Mine Workers Locals 5497, 2262, 1441, 1785, 1810, 1941, 1447, and 6271 because of picketing activities that caused work stoppages at Consol's Ireland, McElroy, and Shoemaker mines in West Virginia. Employees at these Consolidation mines are members of the United Mine Workers, but none of the three local unions were joined as parties-defendant. All the defendant-locals represent employees at mines owned and operated by other companies.[1] Consolidation aimed its complaint at these foreign locals because of its belief that unidentified pickets who appeared at Consol's West Virginia mines were members of these locals.[2]

Consol's complaint stated two causes of action. Jurisdiction in the first count was alleged under diversity of citizenship, 28 U.S.C. § 1332, and a state law claim was brought against each of the local unions based on tortious interference with Consol's existing employment contracts. Count II was brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for breach of contract. It named as defendants only the International Union and District 6.

■ On appeal Consolidation abandons any claim that it is entitled to an injunction because of state law making it unlawful to tortiously interfere with employment contracts. Consolidation recognizes, as it must, that the only known exception to the prohibition of Norris-LaGuardia[3] against federal injunctive relief applicable to this case is *Boys Markets.*[4] To come within that doctrine, the plaintiff alleged picketing activity and refusal of its employees to cross the picket line and to file a grievance over their right to honor said picket lines. The complaint pairs that dispute with the obligation in the 1974 agreement[5] to continue work without interruption and prays for the following relief:

1. That an injunction be issued enjoining defendant Local Unions, their officers, representatives and members, and all persons acting in concert with defendant Local Unions or in their behalf, *from picketing,* or in any other manner *interfering with* the orderly resumption of, or continuation of, operations at the McElroy, Shoemaker and Ireland Mines and/or any other mines of plaintiff.

2. That an injunction be issued enjoining the International Union and District 6, their officers, representatives and members from *engaging in, condoning, encouraging, supporting or ratifying picketing or other interference of* the orderly resumption of, or continuation of, operations at McElroy, Shoemaker and Ireland Mines and/or other mines of plaintiff.

3. That the International Union and District 6 and their officers, representatives and members undertake all action necessary to require the members of the defendant Local Unions to cease the

---

1. Members of Local 6271 are employed at Valley Camp Coal Company's Moundsville, West Virginia, mine; the members of the other defendant-locals work for North American Coal Corporation.

2. Apparently the picketing was occasioned by an employee dispute with other coal companies concerning implementation of Article V of the National Bituminous Coal Wage Agreement of 1974—a "safety" provision which involved the presence of "helpers" in the mines. We are told by the Union that the helper dispute spread to Consol's employees at Ohio mines, and they suggest that toward the end of the work stoppage at the mines involved in this suit some of the pickets may have been Consol's employees at those Ohio mines. Brief for Appellant at 43 n. 8. *See* App. 290–93.

3. The Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq. See especially* 29 U.S.C. § 104(a), (e), (f), and (i).

4. *Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

5. National Bituminous Coal Wage Agreement of 1974.

*present illegal picketing* activities at McElroy, Shoemaker and Ireland Mines and/or other mines of plaintiff.

(Emphasis added.)

The preliminary injunction orally entered on April 17, and reduced to writing and filed on June 5, granted the following relief:

1. A Preliminary Injunction be and it is issued enjoining the defendant District 6, United Mine Workers of America, the defendant International Union, United Mine Workers of America, their officers, representatives and members and all persons acting in concert with them or in their behalf from *engaging in, condoning, encouraging, supporting or ratifying the work stoppage* which began on March 13, 1975 and continuing at the present time involving the concerted refusal of the members of said defendants employed at the Ireland, Shoemaker and McElroy mines to abide by the terms of the collective bargaining agreement and from *encouraging, supporting or ratifying the illegal picketing activity* by defendant local unions, their officers, representatives or members or any others acting in active concert with or on behalf of said defendant local unions who receive actual notice of this order;

2. Defendant Local Union Nos. 5497, 2262, 1441, 1785, 1810, 1941, 1447, and 6271 are hereby restrained from *engaging in or continuing to engage in picketing activity* at plaintiff's McElroy, Ireland and/or Shoemaker mines.

3. The defendant District 6 and defendant International Union and their officers undertake immediate action necessary and available to them to require their members employed at the McElroy, Ireland and Shoemaker mines to cease the present *illegal work stoppage* and to require their members to discontinue the *picketing activity* at plaintiff's aforesaid mines.

(Emphasis added.)

We think the relief sought and granted went beyond the limits of *Boys Markets,* and accordingly, we reverse.

## I.

In this circuit it is settled that the *Boys Markets* exception to the Norris-LaGuardia prohibition of injunctions in labor disputes applies in these circumstances:

(1) The Employer and the Union have expressly or impliedly agreed that during the term of the labor relations agreement there will be no strike or work stoppage, and that disputes shall be submitted to arbitration.

(2) Work ceases because the employees refuse to cross a picket line.

(3) The contract may rationally be interpreted to mean that exercise of the statutory right to honor a picket line is an exception to the contract obligation to continue work without interruption or may be interpreted to mean that the agreement to not engage in a work stoppage is a relinquishment of the right to honor a picket line.

(4) The Employer asks its employees to return to work pending submission of the question to arbitration but the employees refuse and fail to grieve the question.

We have held that such a situation presents an "arbitrable grievance" within the meaning of *Boys Markets* and that, if the other factors necessary for equitable relief are present, the district courts may enjoin the work stoppage pending arbitration. *See Windsor Power House Coal Co. v. United Mine Workers,* 530 F.2d 312 (4th Cir. 1976); *Armco Steel Corp. v. United Mine Workers,* 505 F.2d 1129 (4th Cir. 1974), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975); *Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters,* 497 F.2d 311 (4th Cir.), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Wilmington Shipping Co. v. International Longshoremen's Ass'n,* No. 73–2354 (4th Cir. June 19, 1974), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); *Monongahela Power Co. v. Electrical Workers Local 2332,* 484 F.2d 1209 (4th Cir. 1973). *Accord Island Creek Coal Co. v. United Mine Workers,* 507 F.2d 650 (3d Cir.), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150,

46 L.Ed.2d 110 (1975); *NAPA Pittsburg, Inc. v. Automotive Chauffeurs Local 926,* 502 F.2d 321 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974). *But see Buffalo Forge Co. v. United Steelworkers,* 517 F.2d 1207 (2d Cir.); *cert. granted,* 423 U.S. 911, 96 S.Ct. 214, 46 L.Ed.2d 139 (1975); *United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236 (5th Cir. 1975); *Amstar Corp. v. Amalgamated Meat Cutters,* 468 F.2d 1372 (5th Cir. 1972).

All of the elements are present here except the last one. Instead of insisting that its employees honor the integrity of the contract and ignore the picket lines, Consolidation deliberately [6] chose to ignore what we have held to be an arbitrable grievance: refusal to cross a picket line.

■ Instead, it insisted that the 1974 contract bound the International and District Union and all members (not simply its own employees) to give up for the life of the agreement the members' right of symbolic speech—protected, absent waiver, by the First Amendment. The relief Consol sought in the district court was not an order to its employees to go back to work pending arbitration of whether the employees had a right to honor the picket lines. It was, instead, an order compelling employees *of other companies* to cease picketing.[7]

■ We have searched the 1974 contract in vain for any language that conceivably could be read to mean that the Union on behalf of its members has bargained away the right of workers to protest working conditions by picketing or otherwise. The obligation "to maintain the integrity of [the] contract" may be interpreted to mean the right to respect a picket line is relinquished. But those words cannot, we think, mean the right of protest by picketing is given up. We think words of greater speci-

ficity are required to indicate waiver of a right specifically protected by the First Amendment.

Moreover, even if it be thought that an obligation to maintain the integrity of the contract is irreconcilable with the right of members to picket (we are aware of the tradition that mine workers will not cross picket lines), it is nevertheless clear that a dispute between Consolidation and members of the Union who are *not* its employees is not arbitrable. It is not possible to read the contract as establishing a relationship between mine workers and coal producers who do not employ them. This labor relations agreement was designed to govern the relationship of coal producers with their own employees. It is true, of course, that such a contract could be worded so as to control conduct by other locals and other members not employed by an employer but that is a matter of agreement between the parties, and it is clear that this contract does not go so far.

■ That the International Union may be responsible in damages for the concerted activity of members who are not employees of an aggrieved employer [8] does not grant to the employer the right to injunctive relief against foreign locals and their members. Such a right would be dependent upon recognition in the contract *and* a grievance mechanism created by contract to solve such disputes. There is no such right against foreign locals and no such grievance procedure in the 1974 National Bituminous Coal Wage Agreement.

Before granting the preliminary injunction, the district court correctly concerned itself with the question of the arbitrability of the dispute in this case. He avoided the problem of the absence of Consolidation's own locals and its own employees by finding that the International and District 6

---

6. Consol told us at oral argument that the reason its locals were not sued was that the supervisors at those mines "felt that their people would work had it not been for the pickets." Instead they "went after the party that was responsible—that had the authority and the power to stop this activity at our mines."

7. *See* prayer for relief in complaint, *supra,* at 1228–1229.

8. *See Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951 (3d Cir. 1975).

had accepted in the 1974 contract a supervisory responsibility. We need not decide whether that conclusion was correct because, as we have said, the dispute as to whether nonemployees of Consolidation have a right to picket is not arbitrable for the reason that the contract does not mention picketing, nor can it be construed to impliedly give up the right of such foreign employees to picket.

■ The injunction of the district court went beyond the relief sought by Consolidation. He not only enjoined picketing but, in addition, undertook to enjoin the work stoppage. This additional relief, although typical of the *Boys Markets* remedy, was not here available because the employer did not seek it and, more importantly, because it was not predicated upon a finding of an arbitrable dispute [9] (refusal to cross the picket line).[10]

Thus the injunction sought and obtained was not in aid of arbitration but was, instead, to stop a picketing practice unmentioned and unresolved in the labor relations agreement. Whether or not joinder of its own locals was necessary, it is clear that the failure to join and the deliberate choice of seeking relief against foreign locals made the dispute one over the right to picket and not over the obligation to work in spite of the picket line.

Consol in this suit would have us extend the *Monongahela*[11] principle to a dispute that is not arbitrable. In each of our prior cases, *supra* at 1229–1230, the dispute lay in whether the Company's workers had a right to honor a stranger picket line. In this case, however, Consol, by its statements at oral argument and its deliberate choice not to sue its own locals, indicates that it has no dispute with its own workers. In short, Consol has chosen not to grieve whether its employees have a right to honor the picket line, preferring to grieve whether employees of other producers have a right to picket. Since the latter is not

---

**9.** *Boys Markets, supra,* 398 U.S. at 254, 90 S.Ct. at 1594, requires that, as a condition to issuing the injunction, the district court must find that the "strike" is " 'over a grievance which both parties are contractually bound to arbitrate . . . .' "

**10.** The district judge did not distinguish between the arbitrable dispute of refusal to cross the picket line and the unarbitrable dispute of the right to picket—but it was the latter to which he directed his attention.

The Court is of [the] opinion that the pleadings and the record that are here before the Court are indicative of an exception that has been carved into the Norris-LaGuardia Act not by way of minimizing that act but by way of supporting and upholding that act, to use the spirit of the language employed by the Supreme Court in the case of *Boys Market[s] v. Retail Clerks.*

The exception being that in those cases where the parties are bound to arbitrate through the grievance and arbitration procedures and this is the method to resolve the differences between the parties.

*The circuit law seems to be that in matters of the nature that we have before the Court this is an arbitrable grievance* and the matters in controversy here between these parties, *particularly the Windsor Power case,* is a dispute that should be resolved, and therefore, clearly falls within the Boys Market[s] exception.

*As to the Consolidation Coal Company case, we have a little different philosophy of prosecution in that it does not go against the individual unions that are the employees of [these] particular mines. That is, the unions of the mines of Consolidation Coal Company but goes to the outside employees who are in a very real and traditional way interrupting and interfering with the employees-employer relationship.* The theory, or I might say the philosophy of the theory of prosecution appears to be that the vertical structure of the United Mine Workers of America is such that it has control over its membership in their entirety throughout the coal industry. And that from International headquarters and its organizations and through the District headquarters and its organization, to the Local unions and their organizations, there is a continuity of authority and control and purpose. This being so, the bridging between one local to another local is accomplished through the District organization or through the respective Districts and always, under the authority of the International Union.

So it would seem that we have here a situation whereby the bridging is in this instance, accomplished through District Six, although that is a viable theory there is also a bridging available through the International. App. 410–11 (emphasis added).

**11.** *Monongahela Power Co. v. Electrical Workers Local 2332,* 484 F.2d 1209 (4th Cir. 1973).

arbitrable, the *Boys Markets* exception to Norris-LaGuardia is not invoked. Accordingly, we hold that even the work stoppage portion of the injunction is barred by Norris-LaGuardia.

## II.

On April 17 the district court orally entered a contempt order against the International and District 6 in the amount of $10,000 and $5,000 for each shift, beginning at 8 a. m. the next day, which did not return to work. It is clear that, since the Mine Workers appealed the entry of the injunction and since their efforts at compliance, while inadequate, were taken in good faith,[12] the judgment of civil contempt[13] falls with our holding that the injunction itself was erroneously entered. *United States v. United Mine Workers,* 330 U.S. 258, 294–95, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Bethlehem Mines Corp. v. United Mine Workers,* 476 F.2d 860 (3d Cir. 1973) (See Opinion Sur Petition for Rehearing); *Heyman v. Kline,* 456 F.2d 123 (2d Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972). *Cf. United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236, 1249 (5th Cir. 1975); *Emery Air Freight Corp. v. Local 295,* 449 F.2d 586 (2d Cir. 1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

*REVERSED.*

---

**12.** Judge Maxwell made a specific finding that the Union's efforts to comply with the injunction were made in "good faith." App. 374.

**13.** In *Windsor Power House Coal Co., supra,* we held a contempt order identical to that in this case to be civil and not criminal in nature. We follow that determination here.